

# PAVAN PARIKH
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

**ELECTRONICALLY FILED**
**May 5, 2023 10:48 AM**
**PAVAN PARIKH**
**Clerk of Courts**
**Hamilton County, Ohio**
**CONFIRMATION 1317020**

**DEMETRIUS HILL**                                   **A 2301892**

vs.

**CITY OF CINCINNATI OHIO**

**FILING TYPE: INITIAL FILING (IN COUNTY) WITH JURY DEMAND**

**PAGES FILED: 31**

EFR200

## IN THE COMMON PLEAS COURT
## OF HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| **DEMETRIUS HILL** | : | **Case No.** _____ |
| 1605 Young Street | : | |
| Cincinnati, OH 45202 | : | |
|  | : | **Judge:** _____ |
| Plaintiff, | : | |
|  | : | |
| v. | : | |
|  | : | |
| **CITY OF CINCINNATI, OHIO** | : | |
| 801 Plum Street | : | |
| Room 215 | : | |
| Cincinnati, OH 45202 | : | |
|  | : | |
| and | : | |
|  | : | |
| **OFFICER ALBERT BROWN** | : | |
| IN HIS OFFICIAL AND INDIVIDUAL | : | |
| CAPACITY | : | |
| c/o City of Cincinnati Law Department | : | |
| 801 Plum Street | : | **COMPLAINT AND JURY DEMAND** |
| Room 215 | : | |
| Cincinnati, OH 45202 | : | |
|  | : | |
| Defendants. | : | |
|  | : | |

Plaintiff, Demetrius Hill ("Plaintiff"), states his complaint against the Defendants, the City of

Cincinnati, Ohio (the "City of Cincinnati"), and Officer Albert Brown ("Officer Brown") (collectively,

"Defendants"), as follows:

### JURISDICTION AND VENUE

1. Jurisdiction and venue are vested with this Court because Hamilton County is where the conduct

    giving rise to this matter occurred and where the Defendants maintain their principal office(s),

    and the amount in controversy exceeds $15,000.

## PARTIES

2. At all relevant times, Plaintiff Demetrius Hill ("Plaintiff" or "Hill") was a resident of Hamilton County, Ohio, and a citizen of Cincinnati.

3. Defendant, City of Cincinnati, Ohio (the "City of Cincinnati") is a political subdivision with its principal place of business located in Cincinnati, Ohio, is organized and existing under Ohio law and is a municipality capable of being sued under Ohio law.

4. Defendant City of Cincinnati operates the Cincinnati Police Department (CPD), a law enforcement agency. The City of Cincinnati is the legal entity responsible for the CPD. At all times relevant to this action, the City of Cincinnati employed, controlled, or had the right to control Officer Brown. Plaintiff bases all applicable and appropriate claims as to Defendant City of Cincinnati and CPD on the doctrines of respondeat superior or vicarious liability, and municipal liability.

5. Defendant Albert Brown ("Brown") is a police officer employed by the City of Cincinnati and the CPD. At all times relevant, Officer Brown acted under color of state law and his actions described herein constituted state action. Officer Brown is sued in his individual and official capacities.

## FACTS

6. On March 3, 2022, at approximately 9:54pm, Plaintiff attempted to purchase Metro bus tickets from a kiosk in downtown Cincinnati, Ohio, near Government Square.

7. Plaintiff paid to the Metro kiosk a total of sixteen dollars ($16.00), but no bus tickets were disbursed by the kiosk to Plaintiff.

8. Plaintiff approached the Metro customer service office to obtain assistance with the kiosk's malfunction.

9. Outside the Metro customer service office, Plaintiff encountered Officer Brown, who was standing in the doorway to the office.

2

10. When Plaintiff inquired as to whether there was a Metro supervisor available, Officer Brown responded in the negative, but asked Plaintiff how he could assist.

11. Plaintiff and Officer Brown then walked over to the Metro ticket kiosk so Plaintiff could show Officer Brown the problem with the kiosk not dispensing the tickets for which Plaintiff had made payment.

12. Officer Brown explained there was nothing he could do to assist with Plaintiff's issue with the kiosk, and instructed Plaintiff to go to the Metro office.

13. When Plaintiff responded to Officer Brown that the Metro office was closed at that time, Officer Brown began to walk away from Plaintiff, and Plaintiff therefore walked toward Officer Brown to continue the conversation.

14. While certain aspects of the March 3, 2022, encounter between Plaintiff and CPD officers described herein were recorded through police body worn cameras (BWCs), other aspects of the encounter were deliberately not recorded or deleted.

15. Cincinnati Police Department Procedure Manual § 12.540 addresses the use of body cameras and specifically provides that such cameras "*must* be activated when the officer arrives on-scene or announces he/she is on-scene in the area and *must be recorded in its entirety.*" (Emphasis added.)

16. Upon information and belief, Officer Brown's BWC was not activated by Officer Brown at any time during the encounter.

17. There were multiple opportunities for Officer Brown and all other CPD police officers present to activate their BWCs during the encounter with Plaintiff on March 3, 2022.

18. Alternatively, if Officer Brown and/or the other CPD officers present did properly activate their BWCs during the encounter with Plaintiff, some of those BWC recordings were subsequently deleted.

3

19. Upon information and belief, such unrecorded (or deleted) videos would have contained information adverse to the Defendants.

20. One of Officer Brown's coworkers, another uniformed police officer, activated his BWC around 10:01pm.

21. When the other unidentified officer activated his BWC, it captured thirty (30) seconds of buffered video footage, for which no audio was captured.

22. The video footage captured from the unidentified officer's BWC shows that, as of 10:01pm, Plaintiff and Officer Brown were engaged in communication with one another. Plaintiff did not brandish any sort of weapon while communicating with Officer Brown about his issue with the Metro ticket kiosk, nor was Plaintiff physically threatening or acting aggressively toward Officer Brown. Plaintiff stood with his arms and hands in front of himself throughout the encounter.

23. During Plaintiff's conversation with Officer Brown, Brown said to Plaintiff, "if you keep following me, I will beat your mother fucking ass."

24. A few seconds later, another unidentifiable police officer stepped toward Officer Brown and placed his hand on Officer Brown's arm in an effort to diffuse Officer Brown's agitated state, as depicted in the following screenshot from the BWC footage provided:

4



25. None of the other CPD officers present during Plaintiff's conversation with Officer Brown appeared threatened by Plaintiff, and no other officer felt compelled to physically restrain, touch, or otherwise act to keep Plaintiff away from Officer Brown. Instead, the officers only sought to keep *Officer Brown* from becoming physical or aggressive *toward Plaintiff*.

26. When Plaintiff took one small step toward Officer Brown, Officer Brown responded by aggressively shoving Plaintiff, with both hands, as depicted in the following screenshot from the BWC footage:

5



27. As a result of the amount of force used by Officer Brown, Plaintiff was knocked to the ground, falling on his back and hitting his head on a brick wall.

28. Plaintiff did not physically assault or threaten Officer Brown at any time on March 3, 2022.

29. Prior to being shoved to the ground by Officer Brown, Plaintiff had not committed any crime on March 3, 2022.

30. Plaintiff was not intoxicated during the March 3, 2022, encounter with Officer Brown.

31. There were no outstanding warrants for Plaintiff's arrest at the time he was shoved to the ground and/or handcuffed by Officer Brown.

32. A few minutes after knocking Plaintiff to the ground, Officer Brown, acting under color of state law and utilizing his apparent authority as a police officer, proceeded to handcuff Plaintiff, thereby placing Plaintiff under arrest.

33. Plaintiff did not physically resist being handcuffed or arrested by Officer Brown.

34. At no time on March 3, 2022, did Officer Brown inform Plaintiff of his *Miranda* rights.

6

35. Between the time that Plaintiff was knocked to the ground and when the CPD officers lifted Plaintiff onto his feet and handcuffed his arms, Plaintiff continued lying on the ground, on his back, and made no attempt to stand up, flee, or physically assault or attack any of the CPD officers. As such, none of the CPD officers, including Officer Brown, had any reason to believe their own safety was in jeopardy following Plaintiff's fall.

36. In fact, at all relevant times therein on March 3, 2022, Officer Brown was accompanied by at least two (2) other armed and uniformed Cincinnati police officers; accordingly, Officer Brown was never in a position in which his safety, health, or wellbeing was threatened by Plaintiff.

37. Plaintiff was not initially told by any CPD officer why Plaintiff was being handcuffed or arrested.

38. Plaintiff remained civil and peaceful during the entire encounter on Government Square on March 3, 2022, including after being placed under arrest.

39. Plaintiff promptly asked to speak to a police supervisor, to which Officer Brown responded that a supervisor was on his way.

40. While waiting for a police supervisor to arrive, Plaintiff remained handcuffed, surrounded by at least six (6) armed and uniformed police officers, for approximately twenty (20) minutes in the presence of numerous onlookers.

41. Before the police supervisor arrived, and while Plaintiff was handcuffed, Officer Brown searched Plaintiff's coat pockets, and seized his wallet and bag, all without Plaintiff's consent.

42. Before the police supervisor arrived, and while Plaintiff was handcuffed and far removed from his personal bag which had been previously seized, Officer Brown searched Plaintiff's personal bag without Plaintiff's consent.

43. Plaintiff's bag was zipped closed prior to being seized, opened, and searched by Officer Brown. Until Officer Brown opened the bag, its contents were not in plain sight.

7

44. At the time that Officer Brown searched Plaintiff's bag, Plaintiff remained handcuffed and several feet away from the area where Officer Brown rummaged through Plaintiff's bag, as depicted in the following BWC footage screenshot:



45. At the time Officer Brown searched Plaintiff's bag, there was no concern for officer safety, destruction of evidence, or emergency.

46. Officer Brown was not conducting a post-arrest, inventory search at the time Officer Brown rummaged through Plaintiff's bag.

47. Officer Brown lacked probable cause to conduct such searches of Plaintiff's bag, coat, or wallet.

48. While still handcuffed, repeatedly Plaintiff stated that Officer Brown lacked probable cause to search his bag.

49. With full knowledge that Plaintiff had not committed a crime and had not acted in a way to warrant Officer Brown's physical assault of Plaintiff, Officer Brown informed Plaintiff that he was "going to jail."

8

50. When the police supervisor, Sergeant Reynolds, arrived at Government Square, Sergeant Reynolds informed Plaintiff that he had two options: either sign a citation for disorderly conduct or go to jail.

51. Plaintiff indicated that he would sign the citation.

52. While uncuffing Plaintiff, Sergeant Reynolds acknowledged that what had transpired did not have to have happened the way it did.

53. With full knowledge that Plaintiff had not committed a crime and had not acted in a way to warrant Officer Brown's physical assault of Plaintiff, Officer Brown filed a criminal charge against Plaintiff for disorderly conduct while intoxicated, despite the fact that Plaintiff was not intoxicated and had not engaged in any disorderly conduct.

54. Upon information and belief, the criminal charge was approved by Sergeant Reynolds, Officer Brown's supervisor, who was also aware that Plaintiff had not committed a crime, had not initiated Officer Brown's physical assault on Plaintiff, and was not intoxicated during the March 3, 2022, encounter. This charge was maliciously filed against Plaintiff in an attempt to cover-up the actions of Officer Brown.

55. Plaintiff felt compelled to enter a guilty plea to avoid further unwarranted sanctioning.

56. Plaintiff's motion to withdraw his guilty plea was denied.

57. As a result, Plaintiff was sentenced to thirty (30) days in jail for the disorderly conduct while intoxicated charge.

<u>CLAIMS FOR RELIEF</u>
**Count One**
**42 U.S.C. §1983 (Fourth Amendment – Excessive Force)**
**Defendant Albert Brown**

58. Plaintiff incorporates the allegations in the preceding paragraphs as if fully restated herein.

59. Officer Brown's use of force against Plaintiff was not reasonable under the circumstances, and was excessive.

9

60. Specifically, Officer Brown, while engaged in regular communication with a civilian about Metro bus tickets, used excessive force against Plaintiff, thereby inflicting pain and injury, by shoving Plaintiff to the ground without reason to do so.

61. Likewise, Officer Brown used unreasonable excessive force when he handcuffed Plaintiff and falsely arrested him.

62. Officer Brown has, under color of state law, deprived Plaintiff of rights, privileges, and amenities secured by the U.S. Constitution, including, inter alia, the Fourth and Fourteenth Amendments to the U.S. Constitution.

63. The Fourth Amendment does not permit Defendant to use excessive force, and the right to be free from excessive force is clearly established.

64. No reasonable officer facing the same circumstances as Officer Brown faced on March 3, 2022, would have found the force used to be reasonable. This is because, among other things, Plaintiff had not committed any crime, was not attempting to flee or evade arrest, was unarmed, weighed less than both Officer Brown and at least one of the other CPD officers present during the encounter, and Officer Brown knew that Plaintiff was simply trying to find out how he could obtain a $16 refund when the Metro ticket kiosk failed to disburse his bus tickets.

65. Officer Brown did not make efforts to temper or limit the amount of force he used, especially when one of Officer Brown's own CPD coworkers attempted to physically separate Officer Brown from Plaintiff immediately before Officer Brown shoved Plaintiff to the ground. Instead, Officer Brown unnecessarily used physical violence without reason.

66. As a result of Officer Brown's actions and use of excessive force, Plaintiff was harmed.

**Count Two**
**Intentional Torts (Assault, Battery, Intentional Infliction of Emotional Distress)**
**Defendant Albert Brown**

67. Plaintiff incorporates the allegations in the preceding paragraphs as if fully restated herein.

10

68. Officer Brown is an employee and/or agent of a municipality.

69. Officer Brown's actions described above were conducted within the scope of his employment or duties.

70. Officer Brown's actions were willful, malicious, and in violation of Plaintiff's known rights.

71. Officer Brown's conduct was intentional and done through the assertion of legal authority over Plaintiff.

72. On March 3, 2022, Officer Brown committed assault and battery upon Plaintiff when he intentionally threatened to "beat [Plaintiff's] mothing fucking ass" and used his hands to physically push Plaintiff to the ground.

73. On March 3, 2022, Officer Brown acted with the intent of causing harmful or offensive contact to Plaintiff, and Plaintiff reasonably apprehended that such harmful or offensive contact would occur, thereby constituting assault.

74. On March 3, 2022, Officer Brown engaged in an act that caused harmful or offensive contact to Plaintiff, without Plaintiff's consent to do so, thereby constituting battery.

75. As a result of such contact by Officer Brown, Plaintiff suffered injury and damages.

76. Officer Brown, through his reckless and indifferent behavior, intended to cause Plaintiff emotional distress.

77. Officer Brown's conduct caused psychological injury to Plaintiff.

78. Officer Brown's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it could be considered utterly intolerable in a civilized community.

79. The mental anguish suffered by Plaintiff was serious and of a nature that no reasonable person could be expected to endure it.

80. Officer Brown's conduct directly and proximately resulted in serious psychological, emotional, and physical injury to Plaintiff.

11

**Count Three**
**42 U.S.C. §1983 (Fourth Amendment – Unlawful Search and Seizure; Personal Property)**
**Defendant Albert Brown**

81. Plaintiff incorporates the allegations in the preceding paragraphs as if fully restated herein.

82. By reaching into the pockets of Plaintiff's coat (while Plaintiff was in handcuffs) and pulling out and searching the item found therein, including Plaintiff's wallet, Officer Brown committed a warrantless search that was not premised upon probable cause or exigent circumstances.

83. Additionally, individuals have a heightened expectation of privacy in the contents of a closed container.

84. Luggage, handbags, backpacks, paper bags, and other containers are common repositories for one's papers and effects, and the protection of these items from state intrusion lies at the heart of the Fourth Amendment.

85. By placing possessions inside a container, an individual manifests an intent that his possessions be preserved as private, and thus kept free from public examination.

86. If an object is in a closed container, the object is not in plain view.

87. A warrantless search of a private bag compromises an individual's interest in preserving the privacy of its contents.

88. Officer Brown, acting under color of law and within the course and scope and in furtherance of his employment as a law enforcement officer with the City and the CPD, seized and searched Plaintiff's personal property without a warrant, without permission or consent, and without probably cause or reasonable suspension, in violation of Plaintiff's clearly established rights guaranteed by the Fourth Amendment of the U.S. Constitution, including the right to privacy.

89. A reasonably prudent law enforcement officer would or should have known that the search of Plaintiff's bag violated Plaintiff's clearly established Fourth Amendment rights to be free from unreasonable searches and seizures.

90. No exceptions to the warrant requirement applied to justify Officer Brown's unlawful search of Plaintiff's personal bag.

91. By reason of Officer Brown's acts as alleged above, Plaintiff has suffered anxiety and emotional distress resulting from the unlawful search of his personal property. As a result, Plaintiff is entitled to general and compensatory damages against Officer Brown in an amount according to proof at trial.

92. Officer Brown's unlawful and unreasonable search of Plaintiff's bag constitutes wanton, willful, reckless, unjustifiable, and malicious conduct warranting the imposition of exemplary punitive damages.

**Count Four**
**42 U.S.C. §1983 (Fourth Amendment –False Arrest)**
**Officer Brown**

93. Plaintiffs incorporates the allegations in the preceding paragraphs as if fully restated herein.

94. Officer Brown arrested Plaintiff on March 3, 2022.

95. Officer Brown did not have probable cause to arrest Plaintiff.

96. Indeed, when Officer Brown handcuffed Plaintiff and told Plaintiff he was "going to jail," a reasonable officer in Officer Brown's position would not have believed Plaintiff was committing (or had committed) any crime.

97. The quick use of handcuffs by Officer Brown on March 3, 2022, was unwarranted.

98. In view of all the circumstances surrounding the March 3, 2022, encounter between Plaintiff and Officer Brown, including, without limitation, the timing of placing Plaintiff in handcuffs and the use and/or extended or continued use of handcuffs on Plaintiff in light of no immediate or articulable threat to the CPD officers, Officer Brown's conduct exceeded the permissible scope of any putative police stop.

13

99. Officer Brown has, under color of state law, deprived Plaintiff of rights, privileges, and amenities secured by the U.S. Constitution, including, inter alia, the Fourth and Fourteenth Amendments to the U.S. Constitution.

100. Officer Brown's actions constituted an unreasonable seizure and false arrest of Plaintiff.

101. Officer Brown's false arrest harmed Plaintiff.

**Count Five**
**State Claim (False Arrest)**
**Officer Brown**

102. Plaintiffs incorporates the allegations in the preceding paragraphs as if fully restated herein.

103. Officer Brown intentionally and unlawfully confined or detained Plaintiff within a limited area, for an appreciable time, against Plaintiff's will, without lawful justification.

104. In intentionally and unlawfully confining or detaining Plaintiff, Defendant acted maliciously, in bad faith, or in a wanton or reckless manner with respect to Plaintiff's rights and interests.

105. As a direct and proximate cause of Officer Brown's foregoing conduct, Plaintiff has suffered damages, or, at a minimum, is entitled to nominal damages.

**Count Six**
**42 U.S.C. §1983 (Fourth Amendment – Malicious Prosecution)**
**Officer Brown**

106. Plaintiff incorporates the allegations in the preceding paragraphs as if fully restated herein.

107. Officer Brown, under color of state law, deprived Plaintiff of rights, privileges, and amenities secured by the U.S. Constitution, including, inter alia, the Fourth and Fourteenth Amendments.

108. In an effort to conceal Officer Brown's misconduct, Officer Brown charged Plaintiff with a criminal violation.

109. Officer Brown's actions constituted a malicious prosecution of Plaintiff.

110. As a result of Defendants' actions, Plaintiff suffered damages.

14

**Count Seven**
**42 U.S.C. §1983 (Violation of Civil Rights)**
**Defendant City of Cincinnati**

111.    Plaintiff incorporates the allegations in the preceding paragraphs as if fully restated herein.

112.    Defendants have, under color of state law, deprived Plaintiff of rights, privileges, and amenities secured by the U.S. Constitution, including, inter alia, the Fourth and Fourteenth Amendments.

113.    Officer Brown's wrongful conduct was the direct result of policies, practices, and customs that allowed excessive force to be used against citizens.

114.    Defendant City of Cincinnati failed to establish adequate policies and procedures to properly train and/or supervise Officer Brown.

115.    Defendant City of Cincinnati and its CPD failed to take sufficient remedial actions to end such policies, patterns of practice, or customs within the CPD.

116.    The condoning of misconduct, and this failure to end such policies, patterns of practice, or customs was a proximate cause to the injuries suffered by Plaintiff.

117.    Defendant City of Cincinnati and its CPD failed to protect the public by allowing Officer Brown to continue in his employment as a City of Cincinnati Police Officer even after repeated reports to the department of his failure to activate his BWC.

118.    Defendant City of Cincinnati and its CPD failed to establish adequate policies and procedures to properly train and/or supervise Officer Brown on conducting lawful searches and seizures, avoiding the use of unnecessary or excessive force, and complying with BWC activation requirements.

119.    Defendant City of Cincinnati and its CPD had policies in place that caused Plaintiff to be arrested, thereby depriving Plaintiff of his Fourth Amendment right to be free from unreasonable search and seizure, as the policies mandated a warrantless arrest of Plaintiff without probable cause.

15

120.    These acts and/or omissions directly and proximately resulted in the violent injury Plaintiff was subjected to at the hands of Officer Brown immediately preceding by his wrongful arrest, along with an invasion into Plaintiff's privacy by virtue of Officer Brown's unlawful search of Plaintiff's contained bag, also in violation of Plaintiff's civil rights.

121.    As a result of these actions, Plaintiff suffered serious injury and damages.

**Count Eight**
**42 U.S.C. § 1983 (Deprivation of Rights)**
**Defendant City of Cincinnati**

122.    Plaintiff incorporates the allegations in the preceding paragraphs as if fully restated herein.

123.    Municipal bodies are liable for constitutional violations under 42 U.S.C. § 1983 when execution of its official policy or custom deprives an individual of its rights protected under the U.S. Constitution.

124.    At all times relevant herein, Officer Brown was an employee and/or agent of a municipality.

125.    Officer Brown's actions, alleged above, were conducted within the scope of his employment or duties.

126.    Officer Brown used excessive force, falsely arrested Plaintiff, conducted an unlawful search and/or seizure of Plaintiff and Plaintiff's personal belongings, and failed to activate his BWC, as required by established policies.

127.    Officer Brown's repeated failure to activate his BWC in violation of CPD policy constitutes a pattern and practice, custom of inaction, custom of tolerance, and amounts to a moving force behind the constitutional violations and injuries inflicted upon Plaintiff, as Officer Brown's failure to activate his BWC resulted in his full interaction with Plaintiff not being captured on video.

128.    The City of Cincinnati and the CPD had a custom of escalating encounters unnecessarily, using excessive force, falsely arresting individuals, conducting unlawful searches or seizures of individuals and individuals' private property, and failing to activate BWCs during encounters with

16

individuals. This custom was persistent and widespread at the time of the March 3, 2022, encounter described herein. *See, e.g., Isham v. Cincinnati*, No. 1:19-cv-00577-MRB (S.D. Ohio, filed July 15, 2019).

129.    For example, other CPD representative, such as Sergeant Nathan Asbury and Officers James Ball, Amber Bolte, and James Lewis, were found by the City of Cincinnati's Citizens Complaint Authority to have conducted improper searches, and Sergeant Asbury was specifically found to have used excessive force. *See* **Exhibit A**, which contains a copy of the investigation report related to these matters.

130.    Policymakers at the City of Cincinnati knew it was highly predictable that CPD officers would escalate encounters unnecessarily, use excessive force, conduct unlawful searches, fail to activate BWCs during encounters with citizens, and unlawfully detain people in light of the pattern of similar constitutional violations by other CPD officers, including Officer Brown.

131.    The City of Cincinnati's failure to provide adequate training on these subjects caused Plaintiff to be falsely arrested, subjected to excessive force and an unlawful search of his personal property, yet unable to produce video footage confirming the same. Such conduct violated Plaintiff's constitutional rights, particularly those provided under the Fourth and Fourteenth Amendments.

132.    Upon information and belief, the City of Cincinnati has failed to adequately discipline CPD officers, including Officer Brown, for officers' failures to activate BWC while interacting with citizens, use of excessive force, unlawful searches or seizures, or false arrests.

133.    By failing to adequately discipline the CPD officers, the City of Cincinnati has perpetuated a custom of tolerance of acquiescence to violations of federal rights.

## Count Nine
### State Claim (Destruction of Records – O.R.C. 149.351)
### Defendant City of Cincinnati

134.    Plaintiff incorporates the allegations in the preceding paragraphs as if fully restated herein.

17

135.    According to the July 5, 2022, final investigation report prepared by the City of Cincinnati's Citizen Complaint Authority ("July 5th Report"), BWC footage existed from "Officers Robertson, Walker, Brown, Newman, Hayes, Sorrells, and Sergeant Reynolds" related to the March 3, 2022, incident.

136.    Pursuant to O.R.C. 149.43, a public records request was submitted by Plaintiff's counsel to the City of Cincinnati on Plaintiff's behalf on July 14, 2022, wherein various public records were sought concerning the foregoing events of March 3, 2022.

137.    Amongst the public records sought pursuant to the foregoing public records request were all video recordings from any and all police officers' BWCs related to the events that occurred on March 3, 2022, involving Plaintiff.

138.    Upon information and belief, Plaintiff and Plaintiff's counsel have received some, but not all, of the BWC videos previously requested.

139.    Despite the July 5th Report specifically referencing the existence of Officer Brown's BWC footage, Defendant City of Cincinnati has failed to produce Officer Brown's BWC footage as requested.

140.    A separate public records request was submitted to the City of Cincinnati by Plaintiff's counsel's law firm on February 9, 2023, wherein various public records were sought concerning ten (10) prior case files mentioned in the July 5th Report related to the police officers who were present for the March 3, 2022, incident.

141.    To date, Plaintiff and Plaintiff's counsel have only received from the City one (1) of the requested prior case files, and Defendant City of Cincinnati has failed to produce the remaining nine (9) prior case files.

142.    Additionally, despite clear video footage depicting Defendant Albert Brown's presence during March 3, 2022, encounter with Plaintiff, the City of Cincinnati's Incident Report ("Incident

18

Report") from the encounter fails to indicate that Officer Brown was present at any time during the encounter. As such, the Incident Report was either not properly prepared, or was manipulated to remove any references to Officer Brown.

143.    Upon information and belief, Defendant City of Cincinnati has removed, destroyed, mutilated, transferred, or otherwise damaged or disposed of multiple records pertaining to the events at Government Square on March 3, 2022, along with prior investigatory case files.

144.    Plaintiff is aggrieved by the removal, destruction, mutilation, or transfer of, or by other damage to or disposition of these records pertaining to the events at Government Square on March 3, 2022, and the prior cases involving the same responding police officers.

145.    Plaintiff is entitled to injunctive relief to compel the City of Cincinnati to comply with its legal duties under Ohio Rev. Code 149.351(A), together with an award of reasonable attorney's fees incurred.

146.    Plaintiff is entitled to an award of $1,000 for each record that the City of Cincinnati has removed, destroyed, mutilated, transferred, or otherwise damaged or disposed, together with an award of reasonable attorney's fees incurred.

### Count Ten
### State Claim (Negligent Training or Supervision)
### Defendant City of Cincinnati

147.    Plaintiff incorporates the allegations in the preceding paragraphs as if fully restated herein.

148.    At all times relevant herein, Officer Brown was an employee, deputy, and/or agent of a municipality.

149.    Officer Brown's actions, alleged above, were conducted within the scope of his employment or duties.

150.    At all relevant times herein, Defendant City of Cincinnati and the CPD had a duty to properly train, supervise, and discipline their employees and agents, including individual police officers.

19

151. Defendants breached that duty, in part, by:

    a.   Improperly training, authorizing, encouraging, or directing officers on the proper use of force.

    b.   Failing to investigate allegations of excessive force.

    c.   Failing to discipline officers for violations of policy related to excessive force.

    d.   Improperly training, authorizing, encouraging, or directing officers on the proper use of body worn cameras.

    e.   Failing to investigate allegations of misuse or nonuse of body worn cameras.

    f.   Failing to discipline officers for violations of policy related to activating and using body worn cameras.

152. Defendant City of Cincinnati and its CPD failed to supervise and train Officer Brown with respect to consistently activating his BWC, as required by CPD policies.

153. In failing to supervise or train Officer Brown, the City of Cincinnati breached its duty owed to Plaintiff.

154. According to his personnel records, Officer Brown has a history of failing to activate his body worn camera during a citizen interaction, including on at least two other instances prior to March 3, 2022.

155. Defendant City of Cincinnati therefore knew or reasonably should have known of Officer Brown's incompetence with respect to activating his BWC when interacting with citizens.

156. By retaining Officer Brown as a CPD officer, Defendant City of Cincinnati directly and proximately caused damage to Plaintiff.

20

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court:

A.  Grant compensatory damages against all Defendants in an amount to be determined at trial;

B.  Grant punitive damages against Defendants, as permitted by law, in an amount to be determined at trial;

C.  Issue appropriate injunctive relief against the City of Cincinnati to protect against illegal removal, destruction, mutilation, transfer of, or other damage to or disposition of police body camera videos and other investigatory records;

D.  Grant Plaintiffs reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, and/or Ohio Rev. Code 149.351; and

E.  Award such other and further relief as is just and necessary.

Respectfully submitted,

*/s/* Sean P. Callan
Sean P. Callan          (0062266)
Micah E. Kamrass      (0092756)
Ilana L. Linder          (0095622)
MANLEY BURKE, LPA
225 W Court Street
Cincinnati, Ohio 45202
Phone: (513) 721-5525
Fax: (513) 721-4268
Email:  sean.callan@manleyburke.com
            mkamrass@manleyburke.com
            Ilana.linder@manleyburke.com
*Attorneys for Plaintiff*

## JURY DEMAND

Plaintiff demands a trial by jury.

*/s/* Sean P. Callan
Sean P. Callan          (0062266)

21

# EXHIBIT A

E-FILED 05/05/2023 10:48 AM  /  CONFIRMATION 1317020  /  A 2301892  /  COMMON PLEAS DIVISION  /  IFIJ



city of
CINCINNATI
*Interdepartmental Correspondence Sheet*

**Case:** #20180

**Investigator:** Morgan Givens

**Complaint Received:** September 2, 2020

**Complainant:** Kandis Gibson

---

**Complaint Summary:**

Kandis Gibson (K. Gibson), alleged Improper Entry, Improper Search, and Improper Pointing of Firearms allegations against Sergeant Nathan Asbury (Sgt. Asbury), and Officers James Ball (P.O. Ball), Amber Bolte (P.O. Bolte), and James Lewis (P.O. Lewis). K. Gibson additionally alleged excessive force against Sgt. Asbury.

K. Gibson alleged that on August 28, 2020, Sgt. Asbury, and Officers Ball, Lewis, and Bolte of the Fugitive Apprehension Squad (FAS) entered and searched her residence without consent nor a search warrant, despite her physical and verbal objections. K. Gibson further alleged Excessive Force against Sgt. Asbury for pulling her out of her doorway by her right arm.

**Persons Involved:**

- Sergeant Nathan Asbury, #S0008, M/W/40 (CPD, Involved)
- Officer James Ball, #P0066, M/W/32 (CPD, Involved)
- Officer Amber Bolte, #P0877, F/W/38 (CPD, Involved)
- Officer James Lewis, #P0695, M/B/48 (CPD, Involved)
  - CCA was unable to speak with Officer Lewis due to his extended leave. His statement to IIS was used in this investigation
- Kandis Gibson, F/B/35 (Civilian, complainant)
- Witness A
  - CCA attempted to contact witness A but was referred to Witness A's attorney. To date, neither the attorney nor Witness A has contacted CCA to provide a statement.

**Evidence Reviewed:**

CPD Records

- Computer Aided Dispatch (CAD)
- Form F648 Citizen Complaint
- Arrest warrant for Joshua Gibson which was granted on August 25, 2020
- Internal Investigation Section (IIS) Report
- Body-Worn Camera (BWC) footage of Officers Ball, Brennan Hiatt, and Gerald Knight
- Records Management System (RMS)
- Statements provided by officers and complainant

Hamilton County Clerk of Courts
- Case 20/CRA/16219 regarding Mr. Joshua Gibson

I

**Authorities**:

CPD Manual of Rules and Regulations § 1.21
CPD Procedure § 12.260 Warrants for Adults: Service and Recording
CPD Procedure §12.545 Use of Force
CPD Procedure §12.550 Discharging of Firearms by Police
CPD Procedure § 12.700 Search Warrant/Consent to Search
Payton v. New York, United States Supreme Court
Steagald v. United States, United States Supreme Court
Fourth Amendment to the United States Constitution

**Discrepancies and Clarifications**

Each officer was asked to explain the evidence which brought them to K. Gibson's residence and their justification to search the residence despite her objections; their responses are listed below:

Sgt Asbury to CCA:
• "We had reason to believe that someone wanted with a felony murder warrant was there"
• "The car that he operated was at his home address the day before; it was parked in her driveway"
• Witness A "told us he's staying with his cousin on Pedretti, and met him there earlier that day"

P.O. Ball to CCA
• Witness A "indicated he was living with his cousin on Pedretti"
• J. Gibson's "vehicle that was not there before, was parked in the driveway"
• After seeing his car in the driveway, the FAS believed, "not only is he living there, but he's there right now"

P.O. Bolte to CCA
• "He had a murder warrant"
• The FAS received information that he was there
• The suspects' vehicle was in the driveway

P.O. Lewis to IIS
• Witness A "told us he was staying there"
• He was staying with a cousin
• When they searched his listed residence, his vehicle was in the garage
• The same vehicle was sandwiched between two cars on Pedretti the following day

**Analysis**:

**Allegation: Improper Entry & Improper Search**

K. Gibson alleged that on August 28, 2020, Sgt. Asbury and Officers James Ball, James Lewis, and Amber Bolte of the Fugitive Apprehension Squad (FAS) entered and searched her residence for her cousin, Joshua Gibson (J. Gibson) without consent nor a search warrant, despite her physical and verbal objections. K. Gibson further alleged Excessive Force against Sgt. Asbury for pulling her out of her doorway by her right arm.

2

On August 27, 2020, the FAS reported to what Sgt. Asbury referred to as, J. Gibson's "home" residence, 1211 Cutter Street, pursuant to an arrest warrant for J. Gibson; he was not present. Witness A was at 1211 Cutter Street and allegedly told the FAS that J. Gibson was at K. Gibson's residence, █████████ Avenue. Additionally, Witness A stated they met J. Gibson at █████████ Avenue the day prior. Lastly, the FAS alleged a vehicle registered to J. Gibson that was observed at 1211 Cutter Street, was later observed at █████████ Avenue the following day.

On August 28, 2020, at approximately 8:15 AM, Sgt. Asbury and Officers Ball, Bolte, and Lewis arrived at █████████ Avenue in search of J. Gibson. The FAS arrived at K. Gibson's residence after developments in their investigation, but to maintain the anonymity of their source, per BWC they did not reveal why they believed J. Gibson was inside. The FAS did state that a vehicle in his name, which was observed at his listed residence the day prior, was now in her driveway.

Upon the FAS arrival, K. Gibson's son, a juvenile, opened the door. Officers waited on the porch while Sgt. Asbury stood perpendicular to the plane of the door. Sgt. Asbury explained that they were searching for J. Gibson, but K. Gibson stated that that he was not in the residence, and they were not permitted to enter without a warrant. K. Gibson attempted to shut her front door, but Sgt. Asbury prevented her from shutting the door by grabbing her right arm which partially pulled her through the door frame. She objected to being grabbed. Sgt. Asbury released her arm, but stated, "We have the right to search and we're going to." K. Gibson responded, "No you do not." To which Sgt. Asbury responded, "We don't want to have to take you to jail." K. Gibson made several phone calls as the officers waited to conduct the search. Sgt. Asbury stated that she needed to sit down while the search was conducted and she was ordered to sit on her couch in her living room with her children, while Sgt. Asbury and Officers Ball, Bolte, and Lewis searched the residence for J. Gibson. The FAS departed after their realization that J. Gibson was not inside the dwelling.

CPD Manual of Rules and Regulations § 1.21 A states, "Members shall not make any arrest, search, or seizure not in accordance with law. The Fourth amendment to the United States Constitution outlines laws related searches and seizures, "The right of the people to be secure in their persons, house, papers, and effects against unreasonable searches and seizures, shall not be infringed upon and no warrants shall issue, but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and persons or things to be seized." The FAS did not possess a search warrant (required by the fourth amendment) to search K. Gibson's residence; but rather FAS only possessed an arrest warrant—which did not have K. Gibson's residence as the place to execute that arrest warrant.

1.  Lack of Sufficient Proof of Residency

In Payton v. New York, the United States Supreme Court held that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling *in which the suspect lives* when there is reason to believe the suspect within" (emphasis added). While the FAS had reason to believe J. Gibson was within the residence at █████████, the police did not provide CCA sufficient evidence to justify a reasonable belief that J. Gibson lived at K. Gibson's residence. Per Sgt. Asbury, the police were at J. Gibson's "home" residence when they were at 1211 Cutter Street. Merely believing that J. Gibson was within K. Gibson's residence, due to Witness A's statement, does not give police the authority to enter, as K. Gibson's residence is that of a third party to the warrant.

Moreover, a mere belief that J. Gibson was "staying" at his cousin's residence, without any other information about how long he was "staying" there, or whether his "stay" temporary, transitory, or long-lasting, does not provide a reasonable basis under law to believe that J. Gibson was living

3

at that residence. Witness A provided the officers with no information to indicate whether J. Gibson was "staying" at K. Gibson's residence for one night, a handful of nights, or for the foreseeable future; and it does not appear that the officers asked those questions. Witness A also did not provide any information about how long J. Gibson had been "staying" at his cousin's house in the recent past. Again, it does not appear that the officers asked those questions. The answers to those questions have a considerable bearing on whether the officers' belief that J. Gibson was living with K. Gibson was reasonable. It is also significant that only one of the four officers told CCA that Witness A used the word "living" to describe J. Gibson's relationship to his cousin's residence; two of those four officers reported that were informed Mr. J. Gibson was merely "staying" at his cousin's home, and one of the four officers did not speak of Witness A's description of the suspect's living arrangements.

While the police observed J. Gibson's car parked at his cousin's residence on the day the officers entered his cousin's residence, that was the only day that the police observed the car there. By the officers' own admission, that car was parked at J. Gibson's home address the day before. Without more, proof of the car's transient presence does not indicate residency.

2.  Lack of Exigent Circumstances

Since the enactment of the Fourth Amendment, cases have been heard which set a precedent regarding searches of residences belonging to third parties when suspects who have arrest warrants are sought at the residences of those third parties. In Stealgald v. United States, the Supreme Court concluded that "a search warrant must be obtained absent exigent circumstances or consent" for a law enforcement officer to legally search for the subject of an arrest warrant in the home of a third party.

In this case, K. Gibson was a third party, and thus a search of her residence would have required a search warrant or exigent circumstances absent reason to believe J. Gibson lived there. Given that there was neither a search warrant, nor consent, CCA must consider whether there were exigent circumstances to permit the entry and search. A review of the evidence does not establish that such circumstances were present. The mere fact that a suspect is wanted for homicide, while compelling, does not satisfy the law's exigent circumstances test, even where there is probable cause to believe a suspect is in a particular residence. Any exigency argument here is also undercut by the fact that the FAS waited until the following day to act on the intelligence information received from Witness A. Specifically, the officers did not visit Ms. Gibson's residence, let alone attempt to enter it, until a day after receiving the tip that J. Gibson was there. The interviewed officers did not provide CCA with sufficient evidence to conclude exigent circumstances were present.

3.  Significance of Need for Search Warrant

When addressing the practicalities of seeking a search warrant even after an arrest warrant has already been obtained, the Supreme Court stated the following in Stealgald:

> [I]n those situations in which a search warrant is necessary, the inconvenience incurred by the police is simply not that significant. First, if the police know of the location of the felon when they obtain an arrest warrant, the additional burden of obtaining a search warrant at the same time is miniscule. The inconvenience of obtaining such a warrant does not increase significantly when an outstanding arrest warrant already exists… In contrast, the right protected -- that of

4

presumptively innocent people to be secure in their homes from unjustified,
forcible intrusions by the Government -- is weighty.

Thus, in Steagald, the United States Supreme Court affirmed the importance of protecting citizens from unauthorized intrusions into their residences.

Per their own statements, the FAS believed J. Gibson was within K. Gibson's residence, but they referred his listed and last known residence as his "home" and merely had reason to believe that he was "staying" with K. Gibson. Again, the differentiation between "staying" and "living" is vital, as allowing law enforcement to search the residence of anyone where they think a wanted person may be present or visiting, is simply not permitted by the law. Search warrants are required to ensure that citizens' rights are upheld and the requirement for probable cause is met. Given the evidence they had, the officers should have obtained a search warrant and allowed a judge to determine if there was enough probable cause to grant them access into the home of the suspect's cousin, K. Gibson. CCA found that the members of the FAS acted in violation of the Fourth amendment of the US Constitution, CPD training, policy, and procedure.

### _Allegation: Excessive Force_

After declining the FAS to enter her residence, Ms. Gibson attempted to shut the door; Sgt. Asbury grabbed her arm and pulled her towards the door. He released her arm after telling her that she was not able to shut the door and her home would be searched despite her objections.

CPD Policy 12.545 Use of Force states, "When officers have a right to make an arrest, they may use whatever force is reasonably necessary to apprehend the offender or effect the arrest and no more." The policy cites to caselaw in stating that:

> The decision to use force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight …the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." CPD Policy 12.545 Use of Force.

While K. Gibson pulled away from Sgt. Asbury as he stood in her doorway, Sgt. Asbury did not have a legal right to enter her residence and search. Sgt. Asbury stated that he grabbed K. Gibson's arm to prevent the door from hitting him as he stood in the plane of the door. However, the BWC shows that while Sgt. Asbury was pulling K. Gibson's arm, the door was not moving toward his body, nor did the door appear to be shutting on him or in the process of impacting his body. The fairest interpretation of all of the evidence is that Officer Asbury's pulling of Ms. Gibson's arm was not reasonably necessary to protect himself but was instead done to gain continued entry into the residence. Sgt. Asbury was entitled to use a reasonable amount of force to protect himself, but not to effectuate an entry that was unlawful. While CCA did not see any evidence of injury, and while his grabbing and pulling did not progress to higher levels of force, those facts are not dispositive. Given that Sgt. Asbury did not have the right to enter, faced no threat from Ms. Gibson, and had no legal basis to arrest or detain Ms. Gibson, no force was permitted, and his force was therefore objectively unreasonable.

5

**_Allegation: Improper Pointing of Firearms_**

Ms. Gibson alleged an officer kept "his gun on us while the other 4-5 officers proceeded to search my house with their rifles drawn."

Procedure §12.550 Discharging of Firearms by Police states, "At such time as a police officer perceives what he interprets to be a threat of loss of life or serious physical harm to himself or others at the hands of another, he has the authority to display a firearm." Given that executing a search warrant for someone who has a warrant for Ohio Revised Code (ORC) 2903.02 Murder is inherently and objectively dangerous, it's reasonable that the officers interpreted there to be a threat of loss of life or the possibility for serious physical harm to themselves or others, as such their display of firearms was permitted. Per BWC the officers did not point their firearms at K. Gibson or her children. For the foregoing reasons, they did not violate CPD Policy, Procedures or Training.

**Findings:**

Sergeant Nathan Asbury
Officer James Ball
Officer Amber Bolte
Officer James Lewis

**Improper Entry** – The allegation is supported by sufficient evidence to determine that the incident occurred, and the actions of the officers were improper. **SUSTAINED**

**Improper Search** – The allegation is supported by sufficient evidence to determine that the incident occurred, and the actions of the officers were improper. **SUSTAINED**

**Improper Pointing of Firearms** – The evidence shows that the alleged conduct did occur but did not violate CPD policies, procedures, or training. **EXONERATED**

---

Sergeant Nathan Asbury

**Excessive Force** -- The allegation is supported by sufficient evidence to determine that the incident occurred, and the actions of the officers were improper. **SUSTAINED**

**Morgan Givens, Investigator**

March 29, 2022
Date

**Gabriel Davis, Director**

March 29, 2022
Date

6

## Previous Contacts and Commendations

### Sergeant Nathan Asbury

### Previous Contacts with CCA

Sergeant Asbury had two previous contacts with CCA in the past three years.

| Case Number | Allegation | Finding |
|---|---|---|
| 17225 | Excessive Force | Not Sustained |
| 18185 | Improper Entry | Not Sustained |
| 18185 | Improper Search | Not Sustained |
| 18185 | Improper Procedure | Sustained |

### Previous Contacts with IIS

CCA is unaware of any additional previous contact by Sergeant Asbury with IIS.

### Commendations

Sergeant Asbury received six commendations in the past three years.

| Date | Source of Commendation |
|---|---|
| 03/29/2016 | CPD |
| 04/06/2016 | CPD |
| 09/27/2016 | CPD |
| 10/14/2016 | CPD |
| 07/21/2017 | CPD |
| 08/09/2018 | CPD |

### Officer James Ball

### Previous Contacts with CCA

Officer Ball had four previous contacts with CCA in the past three years.

| Case Number | Allegation | Finding |
|---|---|---|
| 18021 | Excessive Force (Choking) | Not Sustained |
| 18021 | Excessive Force (Tasing) | Exonerated |
| 18021 | Excessive Force (Hard Hands) | Exonerated |
| 18146 | Excessive Force | Unfounded |
| 18182 | Excessive Force (Tasing) | Exonerated |
| 18182 | Improper Stop | Not Sustained |
| 18182 | Improper Procedure (Contact Card) | Sustained |
| 18183 | Improper Stop | Exonerated |
| 18183 | Harassment | Unfounded |
| 18183 | Improper Search | Exonerated |

7

**Previous Contacts with IIS**

CCA is unaware of any additional previous contact by Officer Ball with IIS.

**Commendations**

Officer Ball received five commendations in the past three years.

| Date | Source of Commendation |
|------|------------------------|
| 02/13/2017 | CPD |
| 03/14/2018 | CPD |
| 08/31/2018 | CPD |
| 08/13/2018 | CPD |
| 02/04/2019 | Other Law Enforcement (OLE) |

**Officer Amber Bolte**

**Previous Contacts with CCA**

Officer Bolte had four previous contacts with CCA in the past three years.

| Case Number | Allegation | Finding |
|-------------|------------|---------|
| 17020 | Improper Entry | Not Sustained |
| 17042 | Improper Entry | Exonerated |
| 18087 | Improper Entry | Exonerated |
| 19083 | Improper Entry | Pending |

**Previous Contacts with IIS**

CCA is unaware of any additional previous contact by Officer Bolte with IIS.

**Commendations**

Officer Bolte received six commendations in the past three years.

| Date | Source of Commendation |
|------|------------------------|
| 12/07/2016 | Civilian |
| 04/19/2017 | OLE |
| 05/10/2017 | OLE |
| 08/31/2017 | CPD |
| 09/25/2017 | CPD |
| 10/01/2018 | CPD |

**Officer James Lewis**

**Previous Contacts with CCA**

Officer Lewis had one previous contact with CCA in the past three years.

8

| Case Number | Allegation | Finding |
|---|---|---|
| 17020 | Improper Entry | Not Sustained |

**Previous Contacts with IIS**

CCA is unaware of any additional previous contact by Officer Lewis with IIS.

**Commendations**

Officer Lewis received five commendations in the past three years.

| Date | Source of Commendation |
|---|---|
| 12/7/2016 | Civil |
| 01/10/2017 | CPD |
| 04/19/2017 | OLE |
| 05/10/2017 | OLE |
| 08/31/2017 | CPD |

9